IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 5, 2016 at Jackson

## STATE OF TENNESSEE v. DONALD KEITH WATTS, A/K/A "DUCK"

**Appeal from the Circuit Court for Dickson County**
**No. 2013-CR-124B     George Sexton, Judge**

---

**No. M2014-02540-CCA-R3-CD – Filed May 13, 2016**

---

The defendant, Donald Keith Watts, a/k/a "Duck," was convicted of rape and sentenced to eight years at 100%. On appeal, he argues that the trial court erred in denying his motion for mistrial because of an allegedly improper argument by the State and that the evidence is insufficient to sustain the verdict. Following our review, we affirm the judgment of of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Hilary H. Duke (on appeal) and Joseph L. Hornick (at trial), Dickson, Tennessee, for the appellant, Donald Keith Watts, a/k/a "Duck."

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Dan M. Alsobrooks, District Attorney General; and W. Ray Crouch, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The defendant was convicted of raping the sixteen-year-old victim while she was unconscious from drinking alcohol and smoking marijuana.

S.M. testified that her parents lived next-door to the victim at the time of the crime, although she did not know her well. On the evening of February 24, 2012, the victim and her father came to the house of S.M.'s parents. Later, they went to the residence of the victim's father, where they all had dinner, and he later passed out

because he had been drinking all day. During the evening, S.M. spoke several times on the telephone with the defendant, whom she used to date. He said he was living at the home of his girlfriend, who was in jail at the time. Later that evening, S.M. and the victim went to the residence of the defendant's jailed girlfriend, where the defendant and another man got into S.M.'s car, and the defendant drove them to the store. Afterwards, they all returned to the defendant's residence where, apparently, the victim and the two men went into a bedroom to smoke marijuana. S.M. wanted to return to her home and was "getting mad and throwing stuff at the door 'cause they wouldn't come out." S.M. said that she was "pretty hammered" that night and, as she was driving home, was stopped and later charged with DUI. She registered a .25% on the breath-alcohol test.

The victim testified that she was seventeen years old but was sixteen at the time of the rape. She was living with her father at the time and remembered "some" of the evening of the rape. She said that her father had "passed out" because he had taken a sleeping pill and, then, she and S.M. began drinking. The defendant made several calls to S.M., and the victim and S.M. decided to go to his residence. When they arrived, the two of them, the defendant, and the co-defendant, Daniel Tharpe, then went to the residence of the defendant's mother to obtain some money. Next they went to a gas station, where Mr. Tharpe was flirting with her and trying to put his arm around her. A third man came to the residence and sold marijuana to the defendant, which they all began smoking as they were drinking beer. The victim went to a bedroom to write in her journal, but she passed out. Later she woke up and found that Mr. Tharpe had "inserted" himself inside of her, and she told him to get off. She got up and ran out the door. The defendant came after her and asked her to come back into the house, but she refused. As she was walking along the highway, a police officer stopped and then took her to the emergency room. While there, she told the medical personnel that she had been raped, and a rape kit examination was performed on her. Until the results of the examination came back, she did not know that she had sexual contact with the defendant and had not consented to do so.

Nicholas Todd Seagraft said that on February 24, 2012, around 3:00 a.m., he telephoned the local nonemergency dispatch number because he saw a young female walking on the side of the road who did not "look like [she] should be there."

Corporal Jerry Summerour, Jr., of the Dickson Police Department said that on February 24, 2012, he responded to a call regarding a female walking along Highway 48, wearing dark clothing. He went to the area, talked with her, and she said she had been raped. She was crying at the time, and he took her to the hospital to be examined. She gave a description of the vehicle involved in the matter, and the two of them saw it as it passed by a market and was soon stopped by other officers. At the hospital, he met Detective Arnold, and the two of them took a statement from the victim. She said that,

while passed out in a back bedroom of a house on Haley Road, she awoke to find an African-American man on top of her with his penis inside her. Hospital staff gave the victim's rape kit to him, and he delivered it to Detective Arnold.

Detective James Eubank testified that he was employed by the Dickson Police Department and was its evidence custodian. Pursuant to his duties, he transported certain evidence to the Tennessee Bureau of Investigation ("TBI") Crime Laboratory, including certain of the victim's clothing, items from the scene, and a buccal swab taken from the defendant.

Mark Eric Dunlap testified that he was a special agent/forensic scientist assigned to the Serology Unit of the TBI Crime Laboratory in Nashville. Among other items, he performed tests on a vaginal swab from the victim and determined that it contained sperm cells, which matched the DNA profile of the defendant. The odds of finding another individual with a matching DNA profile are greater than the population of the world. The defendant's DNA also was found on the victim's underwear and pants, as well as well as the bed sheet.

Detective Kelly Owen, also employed by the Dickson Police Department, assisted Detective Arnold with the investigation by taking photographs of the crime scene, which were admitted into evidence, including a photograph of a mattress with the words, "Duck got it here," written on it.

The victim's father testified that the victim was living with him at the time of the rape, and S.M. lived next door. On the evening of February 24, 2012, he had gone to buy groceries and brought back some beer that S.M. had asked for. He gave S.M. the keys to the vehicle, which he had borrowed to go to purchase the groceries. He then took medication to help him sleep, and the next event he remembered was being awakened by a police officer at the door telling him his daughter had been sexually assaulted and, then, driving him to the hospital to see her.

Detective Donald Arnold testified that he was employed by the Dickson Police Department and, on February 24, 2012, received a call to the emergency room, where he met the victim. He arranged for the victim to be interviewed by an employee of the Child Advocacy Center. He collected the victim's clothing for DNA testing.

The defendant testified regarding the evening, saying he had called S.M. to give him a ride to town, and the victim was with her when she arrived at his house. They went to his mother's house to obtain some money and then went to a market, where S.M. bought more beer. He admitted he had sex with the victim in the back bedroom of his house but did not know at the time that she was sixteen years old. He said the victim had

3

invited him into the bedroom, where they talked and then had sexual relations. The victim was not unconscious and did not tell him she did not want to have sex with him. When they came out of the bedroom, and S.M. told him the victim was sixteen, he was "scared to death." He told Daniel Tharpe to leave her alone, after learning the victim's age. After Mr. Tharpe had gone back down the hall, the victim came out and said, "I can't believe both of you-all let your friend come back there, and [the defendant] asked her what happened and she said f*** both of you-all and walked out of the house."

## ANALYSIS

We will review the arguments raised on appeal by the defendant, that the trial court should have granted a mistrial because of prosecutorial misconduct during the closing argument and that the evidence is not sufficient to sustain the verdict.

### I. Alleged Prosecutorial Misconduct

The defendant alleges that the State "intentionally made inflammatory statements affecting the outcome of the trial" and sets out the four statements which he argues were improper. In short, the first three statements, none of which were objected to during the trial or raised in the motion for new trial, were that the defendant had allowed "a juvenile to smoke dope in [his] house, going with a juvenile and buying beer, buying marijuana, allowing her to drink in your house"; "knowing that you had sex with a 16-year-old girl, that you drank beer with her, that you smoked pot"; and "[h]ow many red lights do you have to have if you're a 34-year-old man before you decide to not put your penis into a juvenile's vagina." The statement to which the defendant did object to and raise the issue in his motion for a new trial was the State's saying, "Remember yesterday I asked [S.M.] some specifics and she did not remember saying the following: I heard the juvenile scream get out of me." This argument prompted an immediate objection from defense counsel that the State had not asked S.M. if she had made this statement, and the trial court agreed. The trial court added that it was the victim, instead, who had said "get off or get out or something, without question, she testified to that, but [S.M.] never did." When the jurors returned to the courtroom, the court instructed them that the record did not support the State's claim regarding the statement:

> [T]here's been an objection to a portion of the argument and I've sustained the objection. The last statement made by the [prosecutor], you'll disregard that. As I told you earlier in my initial charge, and I'm sure you don't remember everything that I told you, but one of the things I told you was statements by the attorneys are not evidence anyway, they're only made to help you understand the evidence. If a statement's made that's not

4

supported by the evidence, you should disregard it. You should disregard the last statement.

As to the first three statements, we can review only as using a plain error analysis, since a contemporaneous objection was not made. State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000). As for the State's references to the victim as a "juvenile," we note that when she was asked at trial if the defendant knew her age, she responded, "I don't think anyone really asked, but I do look pretty young for my age I would say." Of course, the jury had the opportunity to access the accuracy of this statement. Considering all of this, we cannot conclude that any of the three statements constituted plain error because a clear and unequivocal rule of law was not breached; a substantial right of the accused was not adversely affected; and consideration of the error is not necessary to do substantial justice.

As for the fourth statement from the State's argument, which the State, apparently, was mistaken as to whether he had questioned the first witness regarding it, we likewise conclude that it was not the basis for a mistrial. First we note, as did the trial court in overruling the motion for new trial, that the statement was directed at the co-defendant, and not the defendant on trial. To this we add that the victim, herself, testified that when she regained consciousness and found the co-defendant on top of her, she said, "[G]et the 'F' off of me."

The decision of whether or not to declare a mistrial lies within the sound discretion of the trial court. State v. Land, 34 S.W.3d 516, 527 (Tenn. Crim. App. 2000). A mistrial should be declared in a criminal case only when something has occurred that would prevent an impartial verdict, thereby resulting in a miscarriage of justice if a mistrial is not declared. See id.; State v. Jones, 15 S.W.3d 880, 893 (Tenn. Crim. App. 1999); Arnold v. State, 563 S.W.2d 792, 794 (Tenn. Crim. App. 1977). "Generally a mistrial will be declared in a criminal case only when there is a 'manifest necessity' requiring such action by the trial judge." State v. Millbrooks, 819 S.W.2d 441, 443 (Tenn. Crim. App. 1991) (quoting Arnold, 563 S.W.2d at 794). A manifest necessity exists when there is "no feasible alternative to halting the proceedings." State v. Knight, 616 S.W.2d 593, 596 (Tenn. 1981). The burden to show the necessity for a mistrial falls upon the party seeking the mistrial. Land, 34 S.W.3d at 527. This court will not disturb the trial court's decision unless there is an abuse of discretion. Id.

Applying these considerations, we cannot conclude that the trial court abused its discretion by not declaring a mistrial.

5

## II. Sufficiency of the Evidence

The defendant argues that the evidence is insufficient to sustain the conviction. In considering this issue, we apply the rule that where sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). The same standard applies whether the finding of guilt is predicated upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Matthews, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).

A criminal offense may be established entirely by circumstantial evidence. State v. Majors, 318 S.W.3d 850, 857 (Tenn. 2010). It is for the jury to determine the weight to be given the circumstantial evidence and the extent to which the circumstances are consistent with the guilt of the defendant and inconsistent with his innocence. State v. James, 315 S.W.3d 440, 456 (Tenn. 2010). In addition, the State does not have the duty to exclude every other reasonable hypothesis except that of the defendant's guilt in order to obtain a conviction based solely on circumstantial evidence. See State v. Dorantes, 331 S.W.3d 370, 380-81 (Tenn. 2011) (adopting the federal standard of review for cases in which the evidence is entirely circumstantial).

All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

6

<u>Bolin v. State</u>, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing <u>Carroll v. State</u>, 212 Tenn. 464, 370 S.W.2d 523 (1963)).  "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient."  <u>State v. Tuggle</u>, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was charged in the indictment with violating Tennessee Code Annotated section 39-13-503, which provides, in part:

> Rape is unlawful sexual penetration of a victim by the defendant or of the defendant by a victim accompanied by any of the following circumstances:
>
> . . . .
>
> (2) The sexual penetration is accomplished without the consent of the victim and the defendant knows or has reason to know at the time of the penetration that the victim did not consent[.]

Tenn. Code Ann. § 39-13-503(a)(2).

By its verdict, it is apparent that the jury accredited the victim's testimony, and DNA evidence proved that the defendant sexually penetrated her while she was incapacitated and, thus, he did not have her consent.  The record easily supports this determination.

## <u>CONCLUSION</u>

Based upon the foregoing authorities and reasoning, the judgment of the trial court is affirmed.

_____
ALAN E. GLENN, JUDGE